Floyd W. Estes v. Commissioner. Mame Estes v. Commissioner. Harry E. Leadley v. Commissioner.
Floyd W. Estes v. Commissioner
Docket Nos. 7560, 7561, 7562.
United States Tax Court
1947 Tax Ct. Memo LEXIS 242; 6 T.C.M. (CCH) 401; T.C.M. (RIA) 47099; April 21, 1947
*242 Thomas J. Bailey, Esq., and M. D. Harris, C.P.A., 1102 Olds Tower Bldg., Lansing, Mich., for the petitioners. Clarence E. Price, Esq., for the respondent. MURDOCK
Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in income tax for the calendar year 1941, as follows: Floyd W. Estes
$6,091.29
Mame Estes
6,388.48
Harry E. Leadley
953.92 The only issue for decision is whether the Commissioner erred in holding that a corporation distributed among its assets in liquidation valuable good will, thus increasing the reported gain of the stockholders upon the disposition of their shares through cancellation. Findings of Fact Floyd W. and Mame Estes are husband and wife. They and Harry E. Leadley each filed separate individual income tax returns for 1941 with the collector of internal revenue for the district of Michigan. Estes came to Lansing about 1914, at which time he and his wife purchased a one-half interest in the Elmer L. Jarvis Company, Inc., a corporation carrying on a retail furniture and undertaking business in Lansing. The name of the corporation was changed shortly thereafter to Jarvis-Estes Company. A *243 funeral home was erected in the center of the city in 1923. The activities of the corporation were confined to the undertaking business after April 24, 1929. Leadley purchased a small interest in the business in 1929 and became assistant manager. The Estates purchased the entire 47 1/2 per cent interest which the Jarvises owned in the company. That purchase was made on July 30, 1930. The purchase price was $89,774.26, of which $9,000 was paid for "Good-will of Jarvis-Estes Company." It was recited in the agreement that the sale covered the good will of the Jarvis-Estes Company. The Jarvises agreed not to engage in the funeral business in or near Lansing for a period of 15 years, and the contract provided in case they violated their agreement in this respect "that in addition to any other rights or remedies which second parties [Estes] may have, that the said first parties [Jarvises] will pay to the second parties as liquidated damages for the breach of said agreement, as to the funeral business, the sum of Nine thousand ($9,000.00) dollars, * * * and that such amount may be deducted from the consideration herein provided for." Jarvis had not actively participated in the undertaking *244 business since 1914. The name of the corporation was changed after the aforesaid sale to Estes-Leadley Company. Any person desiring the services of the Estes-Leadley Company usually initiated business by calling the funeral home on the telephone. A representative of the company then called upon the family of the deceased. The call, in about 60 per cent of the cases, was made by either Estes or Leadley, but in all instances they eventually met the family and participated in making the arrangements for the funeral, including the arrangement for a minister, pall bearers, and interment. The service sometimes included assistance in the selection of a cemetery lot. Estes and Leadley took a prominent part in conducting the funerals handled by the corporation. Neither did any embalming. That work was done by other employees who were licensed embalmers. Estes had taken a three-month course in embalming and had worked with funeral directors for about a year before he went into business for himself in 1910. He has been in Lansing since 1914. He was County Coroner there from 1916 to 1924. He has been president and a member of the board of the Y.M.C.A., president of the Rotary Club, a Mason, *245 chairman of a county commission for crippled children, president of the National Society of Selected Morticians, president of the Michigan Funeral Directors and Embalmers Association, and a member of the legislative committee of that association which helped codify the laws of Michigan pertaining to funeral directors. He was personally acquainted with about 60 per cent of the people who employed the company during the years 1937 to 1941: About 51 per cent of the customers had been served previously by the company. Leadley attended Detroit Business University, took a course in embalming lasting 18 months, and served a one-year apprenticeship as an embalmer. He was formerly a conductor on an interurban transportation line, but since 1923 has been engaged continuously in the undertaking business. He was County Coroner for 16 years. He is a Mason and a member of the Kiwanis Club, the Y.M.C.A., Eastern Star, and the Chamber of Commerce. Estes received a salary of $15,000 and Leadley one of $7,000 during the years 1937 to 1941. The company owned ambulances, hearses, limousines, and a modern funeral home. It conducted funerals at this funeral home and also from residences, churches, *246 and fraternal halls. It had 12 or 13 regular employees in 1941. It spent about 5 per cent of its gross income for advertising during the period from 1937 to 1941. It paid dividends on its stock in almost every year, but the record does not disclose the amount thereof. It did about 41 per cent of the funeral directing business in Lansing, although there were about 5 or 6 competing firms in the city. The Estes-Leadley Corporation was liquidated on December 31, 1941, at which time its assets, subject to its liabilities, were transferred to its stockholders in cancellation of their stock. The Estes owned 90 per cent of the stock at that time and Leadley owned 10 per cent. The net book value of the assets transferred in the liquidation was $157,297.65. Each stockholder reported his prorated share thereof as the amount realized on his stock in computing his capital gains for 1941. The [*] stockholders immediately assigned the assets, thus received, to a partnership having the same name, which they had formed to continue in the undertaking business. The Commissioner, in determining the deficiencies, added $78,729.48 as good will to the book value of $157,297.65 and increased the long-term *247 capital gain of each petitioner accordingly. He established the value of good will as follows: Date
Surplus
Stock
Total
Year
Earnings
1-1-37
$113,497.15
$15,000.00
$128,497.15
1937
$ 20,421.50
1-1-38
117,202.35
15,000.00
132,202.35
1938
26,426.30
1-1-39
131,455.40
15,000.00
146,455.40
1939
15,732.28
1-1-40
133,148.07
15,000.00
148,148.07
1940
26,151.88
1-1-41
137,172.43
15,000.00
152,172.43
1941
26,913.21
Total
$632,475.40
$75,000.00
$707,475.40
$115,645.17
Average Investment
141,495.08
Average
Earnings
23,129.03
Fair rate
8%
of return
11,319.61
Fair rate of return on tangible assets
$ 11,319.61
Excess
$11,809.42
Excess earnings of $11,809.42 capitalized at 15%
78,729.47
The stipulation of facts is incorporated herein by this reference. Opinion MURDOCK, Judge: The petitioners contend that the customers of the Estes-Leadley Company were obtained solely by reason of the skill and personal attributes of Estes and Leadley and absolutely no good will attached to the business, as distinguished from those two individuals. The Commissioner maintains that the substantial *248 earnings of the corporation, in excess of a reasonable return on the capital invested in the business, are attributable to good will possessed by the corporation. So much of the success of the business as is attributable solely to the personal abilities, attributes, or acquaintanceship of the two men should not be considered in computing the value of any good will which may attach to the business and which could be transferred as a part of its assets. Providence Mill Supply Co., 2 B.T.A. 791; D. K. MacDonald, 3 T.C. 720; Howard B. Lawton, 6 T.C. 1093. Any competitive preference or advantage which attaches to a particular business may be described as good will. A satisfactory definition is elusive. A name, a location, a group of satisfied customers or other elements of a going business may contribute to the good will of that business. Estes and Leadley have testified and they have introduced some other evidence to show that a part, and allegedly a large part, of the success of the business was due to the personal abilities and attributes of the two men. That evidence has not been disbelieved but, on the contrary, has been given due consideration. *249 It seems clear that the wide acquaintanceship of these two men in the community and their recognized ability to conduct funerals properly has drawn customers to the business. But the evidence as a whole fails to convince the Court that no good will attached to the business itself. It seems reasonable to believe that another funeral director, contemplating a purchase of the business, would have been justified in paying something over and above the value of the physical assets. The Commissioner has determined that the corporation had good will which it distributed to the stockholders along with the other assets and which they continued to use as partners in the same line of business. The evidence shows how he computed that value after allowing substantial deductions for the salaries of the two individuals. He concluded that the earnings of the business for a representative period, to the extent that they exceeded a reasonable return on the capital invested, were attributable to intangibles or good will possessed by the corporation. There were earnings of that kind, and the Court is not satisfied that the personal services of the two individuals were not adequately recognized in the *250 computation. The two Estes in 1930 paid to Jarvis a substantial amount for good will of the undertaking business. The amount which they paid him for his stock in 1930 was substantially more than the book value of a like portion of the stock in 1941, when the corporation was liquidated, although the business was apparently increasing and becoming more valuable during the intervening period. This would also tend to show that they paid Jarvis for good will and that there was good will in 1941. The conclusion has been reached, after considering all of the evidence in the record, that the business, as distinguished from the individuals, possessed some good will at the time of the liquidation. That disposes of the only issue in the case because the petitioners do not challenge the method used by the Commissioner to value the good will. They are not contending that there was good will of lesser value than the value determined by the Commissioner and the record does not afford a proper basis for the determination of any other value. Decision will be entered for the respondent.